## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| AARON FLETCHER, TAMMY FLETCHER, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| CITY OF SUGAR CREEK, MISSOURI, et. al,; | ) ) ) |
| Defendants. | ) ) ) |

Case No. 4:20-cv-00030-RK

## ORDER

Before the Court is Plaintiffs' motion for summary judgment. (Doc. 70.) The motion is fully briefed. (Docs. 71, 86, 87, 102, 103.)[1] After careful consideration and for the reasons explained below, the motion is **GRANTED in part** and **DENIED in part**.

## I. Background[2]

This is a civil rights action seeking damages under 42 U.S.C. § 1983. The amended complaint asserts the following nine claims for relief:

| Count | Claim | Defendants |
|---|---|---|
| Count I | Fourth Amendment excessive force claim | Soule, Butkovich, and Stone |
| Count II | Fourteenth Amendment failure-to-supervise and failure-to-train claim | Soule |
| Count III | First Amendment retaliation claim | All defendants |
| Count IV | Race-discrimination claim in violation of 42 U.S.C. §§ 1981 & 1983 | Layton |
| Count V | Conspiracy claim under 42 U.S.C. §§ 1981 & 1983 | Soule, Butkovich, Stone |
| Count VI | Common law battery claim | Butkovich and Stone |

---

[1] In the course of this summary judgment briefing, Plaintiffs filed multiple documents out of time (initial suggestions in opposition (Doc. 86) and sur-reply (Doc. 103)). In so doing, Plaintiffs did not comply with Rule 6(b) of the Federal Rules of Civil Procedure, the rule governing extensions of time (including once the deadline has expired). In addition, Plaintiffs filed amended suggestions in opposition without seeking leave to do so as otherwise required by Local Rule 15.1(a). Without objection from Defendants, the Court *sua sponte* grants Plaintiffs (1) leave to file a first-amended suggestions in opposition (Doc. 87), and (2) leave to file a sur-reply out of time (Doc. 103). Plaintiffs are cautioned to comply with future deadlines or seek extensions.

[2] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

| Count VII | *Monell*[3] claim based on excessive force and failure-to-train, failure-to-supervise, and failure-to-intervene | City of Sugar Creek, Larson, Soule, and Butkovich |
|---|---|---|
| Count VIII | Deprivation of property without due process of law (firearm) | City of Sugar Creek, Soule, Butkovich |
| Count IX | Deprivation of property without due process of law (cell phone) | City of Sugar Creek, Soule, Butkovich |

In March of 2018, Plaintiffs Aaron and Tammy Fletcher moved into a residence located in Sugar Creek, Missouri, having entered into a contract with the prior owner, Aaron Rainey, to "t[ake] over the mortgage" of the residence. Prior to doing so, Mr. Rainey told the Sugar Creek Building Inspector, Douglas Prier, that he (Mr. Rainey) was "selling or renting to own his property," and that "the Fletchers would be moving in."

<u>Occupancy Permit and Home Occupation License</u>: At the time the Fletchers moved into the residence, a city ordinance required that an occupancy inspection be completed when a residence was vacated and that a new certificate of occupancy be issued by the city's building official.[4] Three days after moving into the residence, Ms. Fletcher completed an "Application for Occupancy Permit." Two days later, then-Sugar Creek Fire Chief (current City Manager) Patrick Casey[5] and Sugar Creek Mayor Michael Larson inspected the Fletcher residence.

During the inspection, Mayor Larson asked Mr. Fletcher about some paint he had on the premises, and Mr. Fletcher told Mayor Larson that he (Mr. Fletcher) had a paint business. (Doc. 102 at 76, ¶ 192.) Then-Fire Chief Casey issued an "Occupancy Permit Checklist" on the same day reporting an "unsatisfactory" (as opposed to "satisfactory") rating only as to the exterior walls/foundation, fire exits/smoke alarms, and plumbing/hot and cold water. (Doc. 72-2.)

---

[3] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[4] Specifically, Sugar Creek Ordinance § 7-6(b) provided as follows:

> It shall be unlawful for any person(s) hereafter to occupy or for any owner or agent thereof to permit the occupation of any residential dwelling unit or addition thereto, or part thereof, for any purpose until a certificate of occupancy has been issued by the city's building official. . . . A certificate of occupancy shall be required after any residential dwelling unit has been vacated before it is occupied again, except that when a dwelling unit has been inspected anytime within one (1) year from the date of last inspection, a new inspection shall not be required.

[5] Current Fire Chief Nathan Richardson testified at his deposition that "[m]ost generally it was the fire department" that conducted the required occupancy inspections, and that "[t]he Sugar Creek Fire Department conducts hundreds of building inspections each year." (Docs. 71-4 at 2; 87 at 11, ¶ 6.)

2

The Application for Occupancy Permit states on the bottom of the document: "Upon Receipt of the Signatures of the Applicant and the Building Official, this application shall become the Occupancy Permit." (Doc. 71-5.) The Application for Occupancy Permit completed by Ms. Fletcher was never signed. (*Id.*)

In early July 2018, Plaintiffs met with Mr. Prier and Building Official Paul Loving in Mr. Loving's office at Sugar Creek City Hall. At this meeting, Mr. Fletcher informed Mr. Prier and Mr. Loving that he was a painter and that he stored paint in the garage and sold paint. (Docs. 73-5 at 15; 87 at 25, ¶ 31.) Mr. Loving informed Mr. Fletcher that the city zoning code required him to obtain a home business license and gave him an application to do so. On August 14, 2018, Mr. Loving sent a letter to Mr. Fletcher, informing Mr. Fletcher about several aspects of the home occupation license requirements under the city code, including that the "primary use of the building, structure or dwelling unit in which the occupation is situated" must be as a "private residence," which the garage structure did not appear to be, and that "[i]f you choose to use a part of your private residence for the paint business then I would encourage you to go ahead with a[] [Home Occupation License] application." (Doc. 74-1.) In addition, the letter also referred to a requirement that written permission from the property owner must be submitted with the application. (*Id.*) Mr. Fletcher attests that Mr. Loving also told Plaintiffs that they needed to obtain written permission from their neighbors as part of the home occupation license application process. (Doc. 89-3 at 3, ¶ 16.)

In an email chain on September 12, 2018, involving Sugar Creek Police Chief Soule, Mr. Loving, and Mayor Larson, among others, Mr. Loving sent the following email:

> The owner, Aaron Fletcher, has mentioned that he thinks he has a 'sovereign' right to operate a business from his home. We have said go through the process and apply. I don't think he is going to cooperate. Maybe a little bee sting would help get this where it belongs if he won't cooperate with the HOL process, if you track my meaning. Need paint anybody?

(Doc. 90-1 at 7.) The next day, Mr. Loving sent another letter to Plaintiffs stating that no home occupation license application had been received and directed Plaintiffs to "immediately desist from all paint sales from the [residence]," until they obtained a home occupation license. (Doc. 74-2.) On the same day, Chief Soule stated on the email chain that "the police department and the fire department will not endorse [Mr. Fletcher] having a business license." (Docs. 90-1 at 102 at 68, ¶ 167.) Finally, on November 8, 2018, Mr. Loving sent a letter to Plaintiffs, informing them

of the home occupation license requirement and that "a non-owner located at the property must have written permission from the owner to operate a home business." (Doc. 74-3.)

Plaintiffs never applied for a home occupation license. They did, however, communicate to Mr. Loving that they had obtained written permission from several neighbors to operate the home business. In early 2019 (sometime around January to March), Mr. Fletcher told Mr. Loving in a meeting at Sugar Creek City Hall that he "was not, in fact, operating a business from the residence" and that he was a "sovereign citizen." Mr. Loving did not pursue the matter further.

Traffic Stop and Firearm: On December 23, 2018, Sugar Creek Police Officer Garrett Holman observed a vehicle stop in the middle of the road in front of his patrol car and drive through a residential yard between a garage and a house. Officer Holman and Sugar Creek Police Officer Nichole Amer conducted an investigative stop of the vehicle and made contact with the driver, Mr. Fletcher. Officer Holman arrested Mr. Fletcher on several outstanding warrants and took Mr. Fletcher to the police station where he was ultimately booked for driving on a revoked license.

On March 21, 2019, Sugar Creek Police Officer Austin Blomquist initiated a traffic stop after observing a vehicle make an illegal U-turn, and made contact with the driver, Mr. Fletcher. Officer Blomquist arrested Mr. Fletcher for making an illegal U-turn, as well as for outstanding warrants. Officer Blomquist removed a firearm that Mr. Fletcher was wearing on his hip. While the vehicle Mr. Fletcher was driving was released to Ms. Fletcher, the firearm recovered from Mr. Fletcher was not. Officer Blomquist transported Mr. Fletcher to the Sugar Creek Police Department where he was booked for driving while revoked. The firearm was placed in a property room locker at the police department.

On April 8, 2019, Plaintiffs went to the Sugar Creek Police Department to attempt to retrieve the firearm. Corporal Amanda Akers, the Sugar Creek Police Department's evidence room officer, met Plaintiffs in the police department lobby. Ms. Fletcher provided Corporal Akers with proof of ownership of the firearm. Corporal Akers then contacted the police dispatcher to conduct a check for firearms release, including for criminal history and active warrants. The dispatcher indicated that Ms. Fletcher had active warrants for her arrest.

While Plaintiffs were at the police department attempting to retrieve the firearm, Sugar Creek Police Detective Tom Butkovich was walking into the police station where he saw two individuals (Plaintiffs) in the lobby arguing with the dispatcher. The dispatcher told Detective Butkovich that the Plaintiffs wanted to pick up a firearm but that they did not have proof of

4

ownership and that one of them had an outstanding warrant. Detective Butkovich had Officer Nicole Amer come into the lobby, and Officer Amer placed Ms. Fletcher under arrest for the active warrants. Detective Butkovich remained in the lobby with Mr. Fletcher.

Mr. Fletcher asked for copies of the officers' "oaths of office and documentation to show that [the officers] were sworn from the state and certified to arrest." Detective Butkovich told Mr. Fletcher that the officers did not have "copies of that on us" and that he "actually had no idea where it was at." (Doc. 75-8 at 7.) Mr. Fletcher flagged down the court clerk who told Mr. Fletcher that those personnel files were kept at City Hall.

Detective Butkovich, who knew Mr. Fletcher's driver's license was suspended, then waited outside the police department to see if Mr. Fletcher would attempt to drive away. Mr. Fletcher left on foot. Detective Butkovich then went to City Hall "because I figured [Mr. Fletcher] was going to come down and ask for copies of our files," and told them, "Hey, this guy is going to come down. If he asks for copies of our employee files, I don't know if he's allowed to have them," and that "[i]f he causes a disturbance, call us." (Doc. 75-8 at 9.) Deborah King, then-Finance Officer/City Treasurer, attests that Detective Butkovich "came to city hall prior to [Mr. Fletcher]'s arrival and told many of us in the office, including me, that Mr. Fletcher was on his way to City Hall," and that Mr. Fletcher "was going to jail again." (Docs. 89-11 at 1, ¶ 5; 102 at 77, ¶ 195.)

A few minutes after leaving City Hall, Detective Butkovich was dispatched to City Hall.[6] Sergeant Aaron Stone of the Sugar Creek Police Department with Chief Soule (whom Officer Stone had just picked up from a vehicle repair shop) responded to City Hall as well. Detective Butkovich told Sergeant Stone and Chief Soule that "there had been a prior disturbance at the Sugar Creek Police Department," and gave them some "background information, including the possibility that [Mr. Fletcher] had a suspended license."

When Detective Butkovich, Sergeant Stone, and Chief Soule arrived at City Hall, Mr. Fletcher was already inside requesting copies of oaths of office and officers' state certifications. Detective Butkovich and Chief Soule told Mr. Fletcher that he would need to make a Sunshine Law request to obtain the documents he wanted. Mr. Fletcher told the officers he had a water bill to pay, and the police officers left City Hall. Mr. Fletcher attests that as they were leaving City

---

[6] While Plaintiffs dispute whether Mr. Fletcher in fact created a disturbance at the City Hall, there is no question that the officers, in some fashion, were dispatched or otherwise responded to City Hall.

Hall, he "overheard one of the officers tell the others not to worry that they were going to get him [i.e., Mr. Fletcher]." (Doc. 89-3 at 6, ¶ 31.)

<u>Driving Without License and Arrest</u>: As they were leaving City Hall, Sergeant Stone noticed a vehicle in the parking lot that was parked outside the marked lines of the parking space. Sergeant Stone ran the license plate and discovered it was registered in Ms. Fletcher's name. (Docs. 75-8 at 15; 75-9 at 11.) Sergeant Stone confirmed with dispatch that Mr. Fletcher did not have a driver's license. Sergeant Stone and Chief Soule drove half a block away in Sergeant Stone's patrol vehicle "to wait and see whether [Mr. Fletcher] was going to drive without a license or not." Detective Butkovich waited in the parking lot of City Hall in an unmarked police vehicle. Detective Butkovich saw Mr. Fletcher exit City Hall and get in the vehicle. Detective Butkovich then radioed the other officers that Mr. Fletcher was "driving off."

When Mr. Fletcher drove past Sergeant Stone and Chief Soule a few minutes later, Sergeant Stone pulled behind Mr. Fletcher and activated his overhead emergency lights to initiate a traffic stop. Detective Butkovich pulled behind Sergeant Stone's police vehicle. Sergeant Stone turned on his siren, but Mr. Fletcher continued to drive and did not stop. Mr. Fletcher drove for approximately four blocks before eventually turning up his street and stopping in front of his neighbors' house, across the street from his residence. (Docs. 75-10 at 18; 87 a 54, ¶ 116; 89-12.)

Sergeant Stone and Detective Butkovich exited their police vehicles with their guns drawn. Sergeant Stone testified at his deposition that he decided to conduct a "high-risk traffic stop," which included drawing his weapon, because he knew that Mr. Fletcher had been known to be armed, that Mr. Fletcher had "taken us to a place that [Mr. Fletcher] knew," that Mr. Fletcher had refused to stop his vehicle, and that he had just responded to a disturbance call. (Doc. 75-9 at 28-29.)

Sergeant Stone ordered Mr. Fletcher to step out of his vehicle. (Doc. 75-9 at 54, ¶ 118; 87 at 58, ¶ 128.) Mr. Fletcher did not do so. Although he did not exit the vehicle, Mr. Fletcher held his hands up where the officers could see he was not holding a weapon. Sergeant Stone and Detective Butkovich holstered their weapons and approached the vehicle. When Mr. Fletcher continued to refuse to get out of the vehicle, Sergeant Stone used his baton to break the driver's side window. Detective Butkovich reached inside the vehicle, opened the door, and pulled Mr. Fletcher from the vehicle. As Mr. Fletcher was pulled from the vehicle, Detective Butkovich used his baton to strike Mr. Fletcher two times on his rear right thigh. Detective Butkovich and Sergeant

Stone placed Mr. Fletcher face down on the ground. Mr. Fletcher did not put his arms behind his back and physically resisted doing so despite the officers' commands to place his arms behind his back.

Bodycam video from Sergeant Stone shows Detective Butkovich used his knee placed on Mr. Fletcher's upper back just below the neck and then on Mr. Fletcher's neck and head area to hold him down while they tried to secure Mr. Fletcher in handcuffs. (Def.'s Exhibit 39 at 00:25-00:59.) Mr. Fletcher struggled and did not allow the officers to place his hands behind his back, requiring the officers to link two sets of handcuffs together, while Mr. Fletcher stated several times that he could not breathe. (Def.'s Exhibit 39 at 00:25-00:59.) Detective Butkovich removed his knee as soon as the officers had secured Mr. Fletcher in handcuffs,[7] and Mr. Fletcher was immediately raised to a standing position.

Mr. Fletcher was then taken to the front of a police car where his head was pushed into the hood. The officers then had some difficulty getting Mr. Fletcher's legs inside the police car and had to remove his boots to do so. Plaintiff's amended complaint alleges that Sergeant Stone and Detective Butkovich "continued to use excessive force [after securing Mr. Fletcher in handcuffs] by slamming his head into a police vehicle and by slamming the police car door on his legs and striking him when putting him in the police car."

While Sergeant Stone and Detective Butkovich were arresting Mr. Fletcher, Chief Soule got out of Sergeant Stone's vehicle and asked a woman standing nearby on the porch of her house who was videotaping the arrest to step back inside her house. Chief Soule otherwise stayed at a distance and did not physically participate in the arrest.

Finally, Mr. Fletcher attests that when they arrived back at the police station, Sergeant Stone (along with another Sugar Creek Police officer who is not part of this lawsuit) "further assaulted and struck" him while placing him in a cell at the police station. (Doc. 89-3 at 7, ¶ 39.) Mr. Fletcher was ultimately arrested, booked, and issued citations for fleeing police, failing to obey a lawful order, resisting an officer, and driving while revoked.

Cell Phone: After Mr. Fletcher was arrested, Detective Butkovich found Mr. Fletcher's cell phone inside the vehicle. Detective Butkovich photographed the phone and returned it to the vehicle. Chief Soule seized the phone and Sergeant Stone transported the phone to the police station. Chief Soule later gave the phone to Detective Butkovich and asked him to "try to write a

---

[7] Detective Butkovich's knee was on Plaintiff for approximately 33 seconds. (*See* Def.'s Exh. 39.)

warrant for it." (Doc. 89-17 at 38.) Plaintiffs were not told the phone had been taken and did not receive a receipt for the cell phone. Detective Butkovich testified at his deposition that he "believed [the cell phone] was seized from Mr. Fletcher illegally" and that in fact he did not seek a warrant for the phone – despite Chief Soule's instruction to do so – because he "felt that it was taken from the vehicle when it shouldn't have been." (*Id.* at 38-39.) Corporal Akers eventually returned the phone to Mr. Fletcher on June 6, 2019. When the cell phone was returned, Plaintiffs discovered that the SIM card was broken and had to pay to retrieve information from the broken phone.

Pit Bull Ticket: On July 4, 2019, Chief Soule communicated to a few Sugar Creek police officers a complaint that had been received about a man walking with a pit bull dog. The police officers responded and made contact with Mr. Fletcher who was walking his dog. The officers observed that the dog "appeared to be a pit-bull" and issued Mr. Fletcher a ticket for having a pit bull dog, in violation of city ordinance,[8] advising him that he had 24 hours to remove the dog from city limits or provide paperwork showing that the dog was not a pit bull. (Docs. 89-24; 102 at 79, ¶ 202.)

Further facts are set forth as necessary.

## II. Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "Once the movant fulfills its responsibility of informing the court of the basis for its motion, identifying the portions of the record that demonstrate the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Hess v. Union Pac. R.R. Co.*, 898 F.3d 852, 857 (8th Cir. 2018) (citation and quotation marks omitted). The necessary inquiry is whether "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248. "Only

---

[8] At the time, it appears the City of Sugar Creek had an ordinance prohibiting the ownership and possession of pit bulls. *See* Sugar Creek, Mo., Ord. No. 4297 (Nov. 18, 2019) (repealing Sugar Creek, Mo., Code of Ordinances § 6-46 regarding the ownership of pit bulls), *available at* https://bit.ly/3VslvKX (last visited Oct. 20, 2022).

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co.*, 893 F.3d at 1102 (citation and quotation marks omitted).

## III. Discussion

### A. Count I – § 1983 Fourth Amendment claim for excessive force

"The right to be free from excessive force is included in the Fourth Amendment's prohibition against unreasonable seizures of the person." *Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005). Accordingly, claims of excessive force are analyzed under the Fourth Amendment's reasonableness standard. *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006). The Fourth Amendment's reasonableness standard requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and quotation marks omitted). As the Supreme Court has instructed, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted).

In the context of an excessive force claim, the Eighth Circuit looks to each use of force on its own rather than the officers' conduct as a whole. *Jackson v. Stair*, 944 F.3d 704, 712 (8th Cir. 2019) (holding district court erred by "rul[ing] that Officer Stair's conduct *as a whole* was reasonable without considering whether the second tasing could be a constitutional violation on its own") (citing *Blazek v. City of Iowa City*, 716 F.3d 920, 925 (8th Cir. 2014)) (other citation omitted); *Kasiah v. Crowd Sys., Inc.*, 915 F.3d 1179, 1183 (8th Cir. 2019) (separately analyzing whether the three "distinct 'uses of force' constituted excessive force").[9] To determine whether a

---

[9] Defendants seek summary judgment only as to Mr. Fletcher's claim that "Defendants Soule, Stone, and Butkovich used excessive force when arresting Plaintiff Aaron Fletcher on April 8, 2019," and only consider the officers' actions up to securing Mr. Fletcher in handcuffs. Defendants do not address the additional excessive force allegations as stated in Count I of Plaintiffs' Amended Complaint, including the officers' conduct of pushing Mr. Fletcher onto the hood of the police car and in placing him inside the police car, as well as Sergeant Stone's alleged continuous assault of Mr. Fletcher at the police station when

use of force constitutes excessive force, the Court must consider "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 930 F.3d at 396 (citation omitted). In other words, the "facts and circumstances of each particular case" are critically important, and relevant factors for the Court to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

### 1. Sergeant Stone and Detective Butkovich

In Count I, Mr. Fletcher alleges that Chief Soule, Sergeant Stone, and Detective Butkovich violated his constitutional rights by using excessive force when arresting him on April 8, 2019. Defendants argue that they are entitled to summary judgment because Sergeant Stone and Detective Butkovich did not use excessive force against Mr. Fletcher by (1) drawing and pointing their firearms at Mr. Fletcher, (2) breaking the driver's window with a baton (Sergeant Stone), and (3) using physical force against Mr. Fletcher to arrest him and secure him in handcuffs. Defendants do not address the additional excessive-force allegations as set out in Count I of the amended complaint including the officers' conduct after having secured Mr. Fletcher in handcuffs and the alleged assault by Sergeant Stone later on at the jail. Accordingly, this summary judgment order does not address or consider any excessive-force allegations beyond those addressed in this section.

In opposing summary judgment, Mr. Fletcher primarily focuses on the facts leading up to his arrest, including whether there was in fact a disturbance at Sugar Creek City Hall and the fact that Sergeant Stone did not ticket the illegally parked vehicle he observed but waited to see whether Mr. Fletcher would drive away in the vehicle. Such emphasis is misplaced, however, in the context of this excessive-force claim. When faced with a Fourth Amendment claim of excessive force, the proper "analysis focuses on the reasonableness of the seizure itself . . . and not on the events leading up to it." *Gardner v. Buerger*, 82 F.3d 248, 252 (8th Cir. 1996); *accord Banks v. Hawkins*, 999 F.3d 521, 525-26 (8th Cir. 2021) (noting the reasonableness of force used is analyzed "by looking

---

placing him inside a cell. Rule 56(a) specifically states that "[a] party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Defendants did not seek summary judgment as to these additional excessive-force allegations. Accordingly, this summary judgment order does not address or consider any excessive-force allegations beyond those addressed in this section.

primarily at the threat present *at the time*" the officer deployed force). In *Webb v. City of Waterloo*, No. 17-CV-2001-CJW-MAR, 2019 WL 6736219 (N.D. Iowa Dec. 11, 2019), the district court rejected a similar argument made by a § 1983 excessive-force plaintiff:

> Plaintiff's focus on what he believes was wrongful conduct by Officer Nissen leading up to the shooting (whether Officer Nissen did or did not see plaintiff drinking, whether Officer Nissen's badge was visible, and whether Officer Nissen announced that he was a law enforcement officer, for example) is misplaced. The Court's analysis must focus on the reasonableness of the seizure itself, that is, the shooting, and not on the events leading up to it. As the Eighth Circuit Court of Appeals has explained:
>
> > The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general. Consequently, we scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment.
>
> *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993).

*Id.* at *10-11 (other citation omitted).

As to the officers' drawing of their firearms, the Eighth Circuit has explained that "it is unreasonable to point a gun at a compliant suspect for an unreasonably long period of time after the police have taken control of the situation." *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) (citing *Wilson v. Lamp*, 901 F.3d 981, 985 (8th Cir. 2018); *Rochell v. City of Springdale Police Dep't*, 768 F. App'x 588, 589 (8th Cir. 2019)). In *Pollreis*, for example, a police officer held at gunpoint two minors who vaguely matched the description of two suspects who had fled from police, crashed a car nearby, and fled the scene on foot. *Id.* at 741. The police officer held the minors at gunpoint for seven minutes until backup arrived and the minors were secured in handcuffs, even though the minors had complied with his commands including to lie on the ground before other officers arrived at the scene. *Id.* at 742. On appeal, the Eighth Circuit noted that the police officer "lacked the personal knowledge to rule out the boys as suspects . . . and he did *not* continue to point his gun at the boys after they were frisked," and concluded that the officer did not use unreasonable force by "point[ing] his gun at the boys before the situation was under control (e.g., suspects restrained, patted down, and definitively identified)." *Id.* at 748 (emphasis in original); *see also Biggs v. City of Md. Heights*, No. 4:20-cv-01499-JCH, 2022 WL 1451670, at *1, 6-7 (E.D. Mo. May 9, 2022) (finding no excessive force when police officer held driver at gunpoint for two minutes while waiting for backup to arrive after having attempted to initiate a

11

traffic stop and the vehicle continued to drive for a short distance, and when the officer "moved the line of sight for his firearm away from [the driver]" when the driver raised his hands in the air).

Here, Sergeant Stone and Detective Butkovich drew their weapons after Sergeant Stone had attempted to initiate a traffic stop of Mr. Fletcher for driving without a valid license and after Mr. Fletcher led the officers on a short (even if slow-moving) pursuit for several blocks.[10] Video of the traffic stop shows that Sergeant Stone and Detective Butkovich only briefly drew their weapons and pointed them at Mr. Fletcher, and it is undisputed that shortly after having done so, the officers promptly holstered their guns as they moved to approach Mr. Fletcher's vehicle when they could see Mr. Fletcher's hands were held in the air. There is simply no evidence that either Sergeant Stone or Detective Butkovich kept their weapons out and pointed at Mr. Fletcher for an unreasonably long time or that any officer did so after the situation was fully under control. Indeed, the undisputed facts show that Sergeant Stone and Detective Butkovich holstered their weapons *before* the situation was fully under control (i.e., when Mr. Fletcher was restrained and patted down). Under these circumstances, Sergeant Stone and Detective Butkovich did not employ unconstitutional excessive force against Mr. Fletcher by drawing their weapons for a brief time following a short pursuit after a traffic stop was initiated.

Neither was Sergeant Stone's breaking of the driver's door window or both officers' using physical force to remove Mr. Fletcher from the vehicle unconstitutional excessive force under the circumstances. It is undisputed that Mr. Fletcher refused to stop after Sergeant Stone initiated the traffic stop and that, although he did hold his hands up after finally stopping his vehicle, Mr. Fletcher refused the officers' several commands to get out of the vehicle. It was objectively reasonable under these circumstances for Sergeant Stone to break the driver's door window to gain access to the vehicle and for the officers to physically remove Mr. Fletcher from his car. *See Janis*

---

[10] Mr. Fletcher provides no legal support for the relevance of his argument that the vehicle pursuit was unlawful under state law for various reasons (including that neither the City of Sugar Creek nor the police department had enacted a vehicle pursuit policy as ostensibly required by state law) in evaluating his § 1983 claim for excessive force under the Fourth Amendment of the United States Constitution. In *Gerling v. City of Hermann*, 2 F.4th 737 (8th Cir. 2021), the Eighth Circuit explained that excessive force claims necessarily focus on the "*manner* in which an arrest was carried out," as distinct from "whether law enforcement had the power to arrest," for example. *Id.* at 743-44 (citation and quotation marks omitted). Stated differently, courts "analyze whether [the defendant] used excessive force without regard to whether the arrest itself was justified." *Id.* (citation and quotation marks omitted). Thus, the proper focus of Mr. Fletcher's constitutional excessive-force claim is on the specific uses of force by Sergeant Stone and Detective Butkovich in carrying out the arrest and whether those use of forces were reasonable under the circumstances without regard to whether the arrest (or the traffic stop itself) was justified.

*v. Biesheuvel*, 428 F.3d 795, 800 (8th Cir. 2005) (officers did not use excessive force in pulling plaintiff from vehicle, despite that he was in reality in diabetic shock, where "the use of force was measured, brief, and appropriate to accomplish the purposes of the stop to:  1) secure [plaintiff] and his vehicle; 2) ensure that no criminal activity was afoot; and 3) preserve [plaintiff]'s, the officers', and the public safety in light of the circumstances"); *Miller v. Page*, 04-4198CVNKL, 2005 WL 3557426, at *7 (W.D. Mo. Dec. 28, 2005); *see also Winters v. Adams*, 254 F.3d 758, 765 (8th Cir. 2001) (police officer did not use excessive force in breaking the passenger window and attempting to remove the subject from the vehicle after he refused the officer's request to provide identification by raising the car window, locking the door, and otherwise behaving erratically); *Smith v. Ball State Univ.*, 295 F.3d 763, 770 (7th Cir. 2002) (holding "no reasonable jury could conclude that the [police officers] used excessive force in detaining [plaintiff]" where "the officers were entitled to order [plaintiff] to exit his vehicle," and he refused to do so:  "the officers were justified in using force to remove him, particularly given the potential threat to public safety of an intoxicated driver in command of a running vehicle").

While removing Mr. Fletcher from the car, Detective Butkovich struck Mr. Fletcher twice on the rear thigh with his baton and placed his knee on Mr. Fletcher's upper back and head or neck to hold him down while he and Sergeant Stone attempted to secure Mr. Fletcher in handcuffs. These uses of physical force were objectively reasonable under the circumstances as set forth above, namely that Mr. Fletcher had refused to stop his vehicle when Sergeant Stone initiated the traffic stop, refused the officers' commands to get out of his vehicle after he finally stopped, and resisted the officers' commands to place his hands behind his back.  While Mr. Fletcher maintains that he did not resist the officers, video footage submitted by both parties shows Mr. Fletcher shouting, refusing the officers' commands to get out of the vehicle, and then refusing to place his arms behind his back despite the officers' commands to do so, even after having been removed from the vehicle and placed face-first on the ground.[11]  In fact, to finally secure Mr. Fletcher in handcuffs, the officers had to resort to using two sets of handcuffs linked together.

---

[11] As the Eighth Circuit has recognized,

Although [the court] view[s] the facts and any reasonable inferences in the light most favorable to [the non-movant], [the court] cannot ignore incontrovertible evidence which clearly contradicts [the non-movant]'s allegations.  . . .  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling

*Tatum v. Robinson*, 858 F.3d 544 (8th Cir. 2017), on which Plaintiffs rely, is inapposite. In *Tatum*, the Eighth Circuit held that a reasonable jury could find the use of pepper spray against a suspected shoplifter constituted excessive force. Importantly, the Eighth Circuit found that the immediate use of pepper spray was not reasonable, particularly because "a reasonable officer would not believe [plaintiff] was 'actively' resisting arrest." *Id.* at 549. In the light most favorable to the plaintiff in *Tatum*, the evidence showed there that the plaintiff had only failed to comply with an order to place his hands on a clothes rack and that he argued with the officer, but that he did not physically struggle or attempt to flee from the officer. *Id.* Here, though, Mr. Fletcher did not comply with the officers' several commands to get out of the vehicle and then did not comply with their commands to place his hands behind his back after he was removed from the vehicle. At a minimum, a reasonable officer would believe Mr. Fletcher was resisting arrest by refusing to get out of the vehicle and then physically resisting and refusing to put his hands behind his back as he was instructed to do after having been removed from the vehicle and placed on the ground. The force used by Detective Butkovich and Sergeant Stone in arresting Mr. Fletcher was not objectively unreasonable under these circumstances.

Summary judgment is therefore granted in favor of Sergeant Stone and Detective Butkovich as to Count I regarding Mr. Fletcher's claim of excessive force concerning the April 8, 2019 traffic stop and arrest only for the specific uses of force analyzed above, and is otherwise denied.

### 2. Chief Soule

Chief Soule also argues he is entitled to summary judgment as to Count I because he used no force against Mr. Fletcher during the April 8 traffic stop and arrest. Mr. Fletcher argues that Chief Stone may still be liable under the Fourth Amendment because he did not intervene when Sergeant Stone and Detective Butkovich used excessive force against him.[12] Because the Court

---

on a motion for summary judgment."

*Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In *Wallingford*, the Eighth Circuit viewed the summary judgment record as depicted by a video recording of the police encounter because the video "clearly contradicts the version of the story told by [plaintiff]," and found based on the video, the officer did not use excessive force under the circumstances. *Id.* at 982-93.

[12] Law enforcement officers who "fail[] to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment." *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015) (citation and quotation marks omitted). The Court is skeptical

does not find Sergeant Stone or Detective Butkovich used unconstitutional excessive force as explained above, however, Chief Soule cannot be held liable for failing to intervene as to these uses of force. *See Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018) (affirming summary judgment on failure-to-intervene claim since such claim "may not prevail in the absence of a showing of excessive force") (citing *Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011); *Quinones v. City of Edina*, No. 20-CV-1329 (JS/BRT), 2022 WL 2954028, at *6 (D. Minn. July 26, 2022) (finding "because each officer acted reasonably in using force, no officer had an obligation to intervene to prevent the use of that force"); *Clark v. Ware*, 873 F. Supp. 2d 1117, 1122 (E.D. Mo. 2012) (citing *Putman v. Gerloff*, 639 F.2d 415, 423-24 (8th Cir. 1981)).

Summary judgment is therefore granted in favor of Chief Soule on Count I as to the uses of force analyzed in § III.A.1, above, and is otherwise denied.[13]

### B. Count II – § 1983 Fourteenth Amendment claim for failing to supervise and failing to train Sergeant Stone and Detective Butkovich

In Count II, Plaintiffs assert a Fourteenth Amendment claim against Chief Soule for failing to supervise and train Sergeant Stone and Detective Butkovich regarding the April 8 traffic stop and arrest. It is well established that "§ 1983 liability is personal," meaning "[t]o prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." *White v. Jackson*, 865 F.3d 1064, 1080-81 (8th Cir. 2017) (citations and quotation marks omitted). In other words, "[a]uthorities not involved in the allegedly unconstitutional acts of their fellow public servants have not violated constitutional rights and are entitled to qualified immunity." *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805 (8th Cir. 2010) (citation omitted). Plaintiffs do not dispute that Chief Soule, though present at the April 8 traffic stop, did not use any force against Mr. Fletcher or otherwise participate in his arrest.

Nonetheless, Plaintiffs argue Chief Soule could still be liable under § 1983 for failing to supervise and failing to train Sergeant Stone and Detective Butkovich regarding their use of force

---

that Count I asserts this failure-to-intervene claim against Chief Soule, though, as Count I appears only to assert a claim for excessive force. Nonetheless, to the extent Count I does assert such a claim against Chief Soule, Chief Soule is entitled to summary judgment as explained above.

[13] Although Chief Soule did not expressly seek summary judgment on this basis, the Court "has the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Lerohl v. Friends of Minn. Sinfonia*, 322 F.3d 486, 492 (8th Cir. 2003) (citation and quotation marks omitted). The parties specifically argued whether Chief Soule was entitled to summary judgment on Count I and the Court therefore exercises its power to grant summary judgment as to Chief Soule on the grounds above.

in the course of Mr. Fletcher's April 8 arrest. This claim (like the failure-to-intervene claim discussed above) necessarily depends, however, on an underlying Fourteenth Amendment excessive-force violation. In other words, to the extent Plaintiffs' claim against Chief Soule in Count II rests on the allegations of excessive force employed by Sergeant Soule and Detective Butkovich as discussed above, because the Court does not find they used unconstitutionally excessive force (i.e., force that was not objectively unreasonable under the circumstances), there can be no liability against Chief Soule for failing to supervise or train as to the force used against Mr. Fletcher by Sergeant Stone or Detective Butkovich in the course of the April 8 traffic stop and arrest of Mr. Fletcher. *See Brossart v. Janke*, 859 F.3d 616, 627 (failure to supervise claim foreclosed by conclusion that officers did not use excessive force); *Carpenter v. Gave*, 686 F.3d 644, 651 (8th Cir. 2012) (no liability for failure to train "[w]ithout a showing that the deputies violated the Constitution") (citing *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986)). Summary judgment is therefore granted in favor of Chief Soule on Count II based on the excessive-force claim analyzed in § III.A.1, above, and is otherwise denied.

### C. Count III – § 1983 First Amendment claim for unlawful retaliation

In Count III, Plaintiffs assert a § 1983 claim against "[a]ll Defendants," "including but not limited to, Larson, Richardson, Loving, Layton, and Soule," for unlawful retaliation in violation of the First Amendment. Specifically, Plaintiffs allege that "Defendants . . . took adverse action against [them] by repeated harassment against them about building codes, phantom business license requirements, dog ordinances, zoning laws, traffic ordinances, interference with utility billing, and other matters." (Doc. 34 at 15, ¶ 67.) Defendants seek summary judgment here only as to Mayor Larson, Fire Chief Richardson, Mr. Loving, Public Works Director Edward Layton, and Chief Soule in their individual capacities.[14]

Generally, "the First Amendment prohibits government officials from retaliating against a citizen for exercising [their] right of free speech." *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th

---

[14] To the extent Plaintiffs also reference the City of Sugar Creek, Detective Butkovich, and Sergeant Stone in their summary judgment response to Count III, Defendants construe this as an improper attempt to add claims not previously pleaded. (Doc. 102 at 88-89.) The Court disagrees. Plaintiffs asserted Count III as against all defendants, including the City of Sugar Creek, Detective Butkovich, and Sergeant Stone. Because Defendants do not include the City of Sugar Creek, Detective Butkovich, Sergeant Stone, or Mr. Prier in their motion for summary judgment, this order does not consider Plaintiffs' First Amendment retaliation claims against them as to Count III.

16

Cir. 2017) (citing *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). As the Eighth Circuit has explained:

> In order to demonstrate retaliation in violation of the First Amendment under 42 U.S.C. § 1983, [a plaintiff] must show (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.

*Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (citation and quotation marks omitted). The second element has been described as an "objective test," focusing less on whether the plaintiff was actually deterred and more on what a reasonable person would have done in response to the alleged adverse action, "though how [the] plaintiff acted might be evidence" of the latter. *Scheffler v. Molin*, 743 F.3d 619, 620 (8th Cir. 2014) (cleaned up). Further, a plaintiff "must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was 'singled out' for adverse treatment because of his exercise of constitutional rights." *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (citation omitted); *accord Spencer*, 738 F.3d at 912 (plaintiff "must prove that he would not have [suffered the alleged adverse action] but for an unconstitutional, retaliatory motive" or that the adverse action "was causally related to his protected expression") (cleaned up).

Initially, it does not appear that Defendants contest whether Plaintiffs engaged in any protected activity.[15] Instead, Defendants argue they are entitled to summary judgment because Plaintiffs have not established that Mayor Larson, Fire Chief Richardson, Mr. Loving, Director Layton, and Chief Soule took any adverse action against Plaintiffs. Plaintiffs' primary argument that Defendants (including these individuals) took adverse action against them was by "conspir[ing] to have Chief Soule administer a 'bee sting' or 'bee stings' to Mr. Fletcher to force or intimidate him into compliance" with the city ordinance requiring him to obtain a home occupation license. Plaintiffs argue that the "bee sting" consisted of "continual harassment by the police, threats of building code violations, and even the ticketing of Mr. Fletcher for walking his dog in the neighborhood." To survive summary judgment on this claim, then, Plaintiffs must show an adverse action – i.e., continued harassment by police, threats of building code violations, and

---

[15] Plaintiffs alleged the protected activity in which they engaged included filing complaints with the City of Sugar Creek, taking video at the police station, asking for public information about city police officers, and "peacefully protest[ing] against overregulation."

ticketing Mr. Fletcher for walking his dog – that would otherwise "chill a person of ordinary firmness from continuing the [protected] activity." *Scheffler*, 743 F.3d at 621.

### 1. Chief Soule

To the extent Plaintiffs' First Amendment claim rests on harassment by police, the Court recognizes that generally, "a plaintiff asserting a . . . § 1983 claim that he was prosecuted for exercising his First Amendment rights must plead and prove a lack of probable cause for the underlying charge in order to sustain his First Amendment retaliation claim." *Williams v. City of Carl Junction*, 480 F.3d 871, 875 (8th Cir. 2007) (citing *Hartman v. Moore*, 547 U.S. 250, 265-66 (2006)); *accord Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) (holding that plaintiffs "pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest").[16] The "harassment by police" in this case appears to be grounded in the multiple traffic tickets Mr. Fletcher received, Plaintiffs' arrests on April 8 (Ms. Fletcher for an outstanding warrant at the police station and Mr. Fletcher for fleeing from police, failing to obey a lawful order, resisting an officer, and driving while revoked), and, most recently, a ticket for having a pit bull dog in violation of a city ordinance. Plaintiffs have presented no evidence, however, that the multiple tickets and arrests on which they now rely in part for the basis of their First Amendment retaliation claim lacked probable cause. Plaintiffs suggest in their summary judgment briefing that the dog Mr. Fletcher was walking when he received a ticket was "not a pit bull." (Doc. 87 at 75, ¶ 202; 99 (arguing the officers "falsely claim[ed] that [Mr.] Fletcher had a pit bull").) Plaintiffs have provided no factual or evidentiary support for this assertion, however, and cannot rely on mere speculation or "belief" without setting forth some evidence and factual basis at this stage. *See Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028 (8th Cir. 2006) ("speculation and conjecture are insufficient to defeat summary judgment") (citation omitted).

Because Plaintiffs have not sustained their evidentiary burden as to their First-Amendment retaliation claim against Chief Soule, summary judgment is granted in favor of Chief Soule as to Count III.

---

[16] *Nieves* included a limited exception to the so-called "no-probable-cause requirement" in cases where objective evidence demonstrates the plaintiff was arrested when similarly situated individuals not engaged in the same sort of protected speech had not been arrested. 139 S. Ct. at 1727. Plaintiffs have not presented or relied on any such objective evidence in this case.

## 2. Mr. Loving

Next, Plaintiffs argue that Defendants unconstitutionally retaliated against them by "threat[ening] building code violations." As best as the Court can discern, Plaintiffs argue that the letters sent by Mr. Loving to Plaintiffs concerning the home occupation license, including the September 13 cease-and-desist letter, were adverse actions taken against them in retaliation for exercising their First Amendment rights.[17] In large part, it appears this claim is based on Mr. Loving's testimony at his deposition that he believed the city's home-occupation-license ordinance was a "bad ordinance" that could not be evenly enforced, which was why he ultimately did not pursue an ordinance violation against Plaintiffs regarding Mr. Fletcher's paint-selling business. (Doc. 89-21 at 8-9.) The critical question here is whether these letters and communications would "deter a person of ordinary firmness from continuing to speak out." *Naucke*, 284 F.3d at 928.

In *Garcia*, the Eighth Circuit recognized that "this sort of question [what a reasonable person would have done in reaction to the alleged adverse action] is usually best left to the judgment of a jury." *Garcia*, 348 F.3d at 729. There, the Eighth Circuit determined a jury should decide whether the several parking tickets issued to the business owner after the business owner complained about a bicycle-sidewalk ordinance not being enforced would have caused a reasonable person of "ordinary firmness" to "slow[]down, at least to some degree" the exercise of First Amendment rights. *Id.* Specifically, the Eighth Circuit reasoned that the "[d]efendant, in his capacity as Mayor, engaged the punitive machinery of government in order to punish [plaintiff] for her speaking out" by issuing parking tickets which although relatively minor "have concrete consequences." *Id.*

While it is a close question, the Court finds that a jury should similarly decide whether the multiple letters and communications from Mr. Loving, as the City Building Officer, regarding the home occupation license ordinance, would chill a person of ordinary firmness from further engaging in First Amendment-protected activity. In addition to the letters (including a cease-and-desist letter) and various communications at Sugar Creek City Hall regarding the home-

---

[17] Plaintiffs also appear to argue that Mr. Loving's suggestion one day before sending the cease-and-desist letter in an internal city email that a "bee sting" should be administered was also an adverse action against Plaintiffs. While the emailed remark may well go to demonstrate Mr. Loving's motives underlying the letters and communications regarding the home occupation license, the internal email itself would not and could not "deter a person of ordinary firmness from continuing to speak out." *Naucke*, 284 F.3d 923, 928 (8th Cir. 2002). In short, Plaintiffs' suggestion to the contrary, the email itself is not a proper adverse action for purposes of Plaintiffs' § 1983 First Amendment retaliation claim against Mr. Loving.

occupation-license ordinance, Mr. Fletcher attests that Mr. Loving also told Plaintiffs they needed to obtain written permission from their neighbors to operate a business from their home – a requirement that does not otherwise appear in the relevant city ordinances as a procedural requirement to obtain the license. In sum, it is Mr. Loving's burden as the summary judgment movant to demonstrate that the undisputed material facts show that he is entitled to judgment as a matter of law as to Plaintiffs' First Amendment retaliation claim against him. On this summary judgment record, Mr. Loving has not done so.

Summary judgment is denied as to Mr. Loving for Count III as set forth above.

### 3. Mayor Larson

As to Mayor Larson, Plaintiffs state in their summary judgment brief that they "believe that the Mayor, by interrupting the inspection process, took adverse action by interfering with and thwarting the issuance of the Occupancy Permit and leaving the property open for continued inspection and continued harassment." (Doc. 87 at 98.) Yet Plaintiffs have presented no evidence this is so; Plaintiffs have set forth no evidence that Mayor Larson "interfere[ed] with and thwart[ed]" the Occupancy Permit.

The undisputed facts show that Mayor Larson attended the occupancy inspection of Plaintiffs' residence after Ms. Fletcher applied for an occupancy permit as required by city ordinance. Viewed in the light most favorable to Plaintiffs, the summary judgment record does show that an Occupancy Permit was not ultimately issued to Plaintiffs. However, the summary judgment record includes no evidence *why* it was not issued, let alone that it was not issued because or somehow at the direction of Mayor Larson. Plaintiffs cannot rely on mere speculation or "belief" as stated in their summary judgment briefing, but must set forth some evidence and factual basis to support this argument. *See Bloom*, 440 F.3d at 1028 ("speculation and conjecture are insufficient to defeat summary judgment") (citation omitted). Further, the Court finds that no reasonable juror could conclude on the evidence presented in this summary judgment record that Mayor Larson's attendance alone at the occupancy inspection shortly after Plaintiffs had moved into the residence would "deter a person of ordinary firmness from continuing to speak out." *See also Naucke*, 284 F.3d at 928 (embarrassment, humiliation, and emotional distress including from comments by the City Administrator and city council members to her in public and posting a picture of her house in a grocery store with the caption "The Naucke house. Donations needed," would not deter a person of ordinary firmness from continuing to speak out); *cf. Garcia*, 348 F.3d

20

at 729 (finding issuance of parking tickets sufficient to raise a question of deterrence best suited for the jury in a First Amendment retaliation case, recognizing that the parking tickets, though minor, "have concrete consequences").

Summary judgment is granted in favor of Mayor Larson as to Count III.

### 4.  Fire Chief Richardson

Current Fire Chief Richardson argues he is entitled to summary judgment because he was not involved in the 2018 home occupation inspection and in fact did not become Fire Chief until August of 2019. Plaintiffs provide no response to this argument in their summary judgment response. Plaintiffs have set forth no evidence that Fire Chief Richardson engaged in any adverse action against them. Fire Chief Richardson is therefore entitled to summary judgment on this claim. *See Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (recognizing that § 1983 liability is personal as to each defendant).

Summary judgment is granted in favor of Fire Chief Richardson as to Count III.

### 5.  Director Layton

Similarly, Director Layton argues he is entitled to summary judgment on Count III to the extent Plaintiffs allege he "delayed water billing tactics leading to excessive charges, and disconnection threats for water service" when Plaintiffs "first moved to Sugar Creek." Plaintiffs do not address this argument in their summary judgment response, either. More importantly, the undisputed facts show that Director Layton was not responsible, in any capacity, for water usage billing or the issuance of shut-off notices. (Doc. 78-2 at 2, ¶ 7.) Rather than the Public Works Department, the City Clerk's Office was responsible for such matters. (*Id.*) Because Plaintiffs have set forth no evidence that Director Layton engaged in any adverse action against them, Director Layton is entitled to summary judgment on this claim. *See Davis*, 764 F.3d at 1013.

Summary judgment is granted in favor of Director Layton as to Count III.

### D.  Count IV – §§ 1981 & 1983 claim for race discrimination

In Count IV, Plaintiffs assert a claim for relief under §§ 1981 and 1983, alleging that Director Layton discriminated against them based on their race with "delayed water billing tactics leading to excessive charges, and disconnection threats for water service to their residence when they first moved to Sugar Creek." (Doc. 34 at 16, ¶ 76.) Defendants argue that Director Layton is entitled to summary judgment because the City Clerk's Office handles water billing matters, including disconnecting residential water service. Plaintiffs do not oppose summary judgment in

21

favor of Director Layton and, in fact, Plaintiffs state that they "consent to the dismissal of Count IV" asserted against Director Layton. (Doc. 87 at 100.)[18]

Summary judgment is granted in favor of Defendant Layton as to Count IV.

### E. Count V – §§ 1981 & 1983 claim for conspiracy to deprive Plaintiffs of their civil rights

In Count V, Plaintiffs assert a civil conspiracy claim against Defendants alleging that they engaged in an "orchestrated effort . . . [to] set[] up an unnecessary situation that led to Plaintiff Fletcher's violent arrest [on April 8, 2019], and the constant harassment by all Defendants based on Plaintiffs' race forcing them to relocate" from the City of Sugar Creek.

A civil conspiracy claim under § 1983 requires Plaintiffs to prove: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." *Dean v. Cty. of Gage*, 807 F.3d 931, 939 (8th Cir. 2015) (citation and quotation marks omitted). Conspirators are those who are "voluntary participant[s] in a common venture," which requires only "understand[ing] the general objectives of the scheme, accept[ing] them, and agree[ing], either explicitly or implicitly to do their part to further them." *Id.* (citation and quotation marks omitted).

In opposing Defendants' motion for summary judgment as to Count V, Plaintiffs point to the email chain on September 12 and 13, 2018, involving Chief Soule, Mr. Loving, and Mayor Larson, in which Mr. Loving referenced a "bee sting" against the Plaintiffs. Plaintiffs argue that this email demonstrates that Chief Soule, Mr. Loving, and Mayor Larson "took steps to deprive

---

[18] Plaintiffs consent to the dismissal of Count IV "against all of the Defendants except Paul Loving, Mayor Larson, Chief Soule and the City." In their summary judgment briefing, Plaintiffs advance race-discrimination claims against Mr. Loving, Mayor Larson, Chief Soule, and the City of Sugar Creek. The only grounds for a race-discrimination claim in Count IV of the amended complaint, however, are asserted against Director Layton regarding Plaintiffs' water bill and water service. Plaintiffs do also allege in Count IV that Mayor Larson threatened a black employee of Sugar Creek and that "racist emails [were] circulated among white Sugar Creek personnel." (Doc. 34 at 16, ¶ 74.) These allegations would go only to the intent-to-discriminate element of such race-discrimination claim, if one were asserted against Mayor Larson. However, Plaintiffs do not allege in Count IV a claim that Mayor Larson discriminated against *them* because of their race. Put simply, Plaintiffs did not plead a race-discrimination claim against anyone other than Director Layton and cannot now advance such other claims at the summary judgment stage. *See Wireco WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992-93 (8th Cir. 2018) (holding "the district court did not abuse its discretion when it determined that only those theories of breach that [plaintiff] pleaded in its complaint were before the court," since "the essential function of notice pleading is to 'give the defendant fair notice of what the . . . claim is *and the grounds upon which it rests*'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (ellipses and emphasis in original) (other citations omitted).

22

[the Plaintiffs] of their constitutional rights to due process." (Doc. 87 at 102.) Yet Plaintiffs have not shown a constitutional due process violation related to the April 8 arrest of Mr. Fletcher or as to any "harassment by all Defendants based on Plaintiffs' race." (*Id.*) Without an underlying due process constitutional violation, there can be no civil conspiracy claim. *Novotny v. Tripp Cty.*, 664 F.3d 1173, 1180 (8th Cir. 2011).

Summary judgment is granted in favor of all Defendants as to Count V.

## F. Count VI – Common law battery claim against Sergeant Stone and Detective Butkovich

Next, in Count VI, Plaintiffs assert a common law battery claim against Sergeant Stone and Detective Butkovich related to the April 8 traffic stop. (Doc. 34 at 18.) Sergeant Stone and Detective Butkovich argue that they are entitled to summary judgment under the doctrine of official immunity.

"Under Missouri law, public officials acting within the scope of their authority are not liable in tort for injuries arising from their discretionary acts or omissions." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (citation and quotation marks omitted). The use of force by a police officer in performing his duties is recognized as a discretionary act to which official immunity may apply. *Id.* (citing *Davis v. Lambert-St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006)). Official immunity does not, however, "apply to discretionary acts done in bad faith or with malice." *Davis*, 794 F.3d at 1013 (citation and quotation marks omitted). Generally, bad faith or malice requires "actual intent to cause injury," but it may also be demonstrated by "conscious wrongdoing." *Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005) (citation omitted). Stated another way, "[a] finding of bad faith embraces more than bad judgment or negligence," but "imports a dishonest purpose moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Green v. City of St. Louis*, 583 F. Supp. 3d 1225, 1223 (E.D. Mo. 2022) (citation and quotation marks omitted). To survive summary judgment Plaintiffs must "state[] facts from which it could reasonably be inferred that [Sergeant Stone and Detective Butkovich] acted in bad faith or from an improper or wrongful motive" in the force they used against Mr. Fletcher while arresting him on April 8, 2019. *Boude v. City of Raymore*, 855 F.3d 930, 935 (8th Cir. 2017) (citation and quotation marks omitted); *see Murphy v. Engelhart*, 4:16-CV-04255-FJG, 2018 WL 10014512, at *5 (W.D. Mo. Sept. 19, 2018) (granting summary judgment on assault/battery claims on official immunity grounds because the plaintiff alleged nothing more than the officer "reckless[ly] and outrageous[ly]" caused offensive

23

contact with no allegations that the officer acted in bad faith or with malice); *see also Fortenberry v. City of St. Louis*, No. 4:18-CV-01937-JCH, 2019 WL 1242671, at *7 (E.D. Mo. Mar. 18, 2019) (denying motion to dismiss on official immunity grounds where plaintiff alleged the arresting officers "made disparaging remarks about her same-sex marriage; disdainfully tossed a possession that reflected the Plaintiff's political viewpoint; used obscenities when they addressed her; ignored her screams of pain; and ignored the advice of a medical technician about Plaintiff's condition").

Defendants first argue that the video evidence contradicts Mr. Fletcher's allegations concerning Sergeant Stone and Detective Butkovich's use of force against him during his April 8 arrest following the traffic stop. Not so. In fact, the video evidence is generally consistent with the allegations set forth in Count IV (i.e., that Mr. Fletcher was pulled from the vehicle and towards the ground by his hair, that body-weight pressure was applied to his back and neck by Detective Butkovich placing his knee on Mr. Fletcher's back and neck, and that after he was secured in handcuffs, Mr. Fletcher's head was pushed against the hood of a police vehicle). The video footage does not clearly contradict Mr. Fletcher's allegations. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Cf. Wallingford v. Olson*, 592 F.3d 888, 893 (8th Cir. 2010) (finding deputy's conduct "objectively reasonable" and not excessive force because the video "conspicuously refutes and completely discredits [plaintiff]'s version of the material facts").

Further, Plaintiffs argue that the state doctrine of official immunity does not apply to the battery claim against Sergeant Stone and Detective Butkovich because the evidence suggests that Sergeant Stone and Detective Butkovich were "acting with an intent to administer a 'bee sting' and harm [Mr.] Fletcher." (Doc. 87 at 103.). In response, Defendants argue that the "bee sting" referenced in Mr. Loving's email "was suggesting that someone would need to buy paint from Mr. Fletcher in order to prove he was selling paint out of his residence without a home occupation license." (Doc. 102 at 97-98.) At the summary judgment stage, the Court must view the record presented in the light most favorable to Plaintiffs. In doing so here, there appears at least a question of fact whether the traffic stop and subsequent arrest of Mr. Fletcher, which would include the force used against him, was part of the "bee sting" to which the email from Mr. Loving sent to Chief Soule, among others, referred. It would be improper for the Court to weigh the evidence in the manner suggested by Defendants at this summary judgment stage. The question of whether Sergeant Stone and Detective Butkovich acted with bad faith or malice in the force used against Mr. Fletcher during the course of their arrest on April 8 is a question best left to a jury in this case.

Summary judgment is denied as to Sergeant Stone and Detective Butkovich for Count VI.

**G.      Count VII – *Monell* claim for excessive force, failure to train, failure to supervise, and failure to intervene against the City of Sugar Creek**

In Count VII, Plaintiffs assert a *Monell* claim for municipal liability under § 1983 regarding "excessive uses of force under the Fourth and Fourteenth Amendment, Failure to Train and Supervise and Failure to Intervene." Plaintiffs assert this claim against the City of Sugar Creek.[19] The only constitutional violations to which Plaintiffs refer in their summary judgment response as supporting this *Monell* claim are (1) excessive force, and (2) a procedural due process violation regarding the return of the firearm taken from Mr. Fletcher at one of the earlier traffic stops.

First, the Court previously granted summary judgment in favor of Defendants as to Plaintiffs' excessive force claim regarding the April 8 traffic stop. Without an underlying constitutional violation, there can be no *Monell* liability. *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007). As explained in section H below, however, to the extent Count VII is based on Plaintiffs' alleged procedural due process violation regarding the failure to return the firearm, the Court does not find summary judgment is appropriate on the current record. Therefore, the City of Sugar Creek is entitled to summary judgment on Count VII only to the extent such claim is based on the allegations of excessive force discussed above, and the City of Sugar Creek is not entitled to summary judgment at this stage to the extent such claim is based on the due process violation regarding the return of the firearm.

**H.      Count VIII (firearm) and Count IX (cell phone) – § 1983 claims for deprivation of property without due process of law against Chief Soule, Detective Butkovich, and the City of Sugar Creek**

Finally, in Counts VIII and IX, Plaintiffs assert § 1983 claims for deprivation of their property (a firearm and cell phone) without due process of law against Chief Soule, Detective Butkovich, and the City of Sugar Creek.

First, Defendants argue they are entitled to summary judgment because the firearm and cell phone have both been returned and therefore Plaintiffs' procedural due process claims are moot. Defendants provide no legal authority in support of this argument. In *Alvarez v. Smith*, 558 U.S.

---

[19] Although Plaintiffs included Mayor Larson, Chief Soule, and Detective Butkovich in Count VII, doing so is duplicative because, as the Eighth Circuit has recognized, "[a] suit against a county official in his official capacity is the equivalent of a suit against the county itself." *Doe ex rel. Doe v. Washington Cty.*, 150 F.3d 920, 923 (8th Cir. 1998) (reasoning that "[n]aming both the sheriff and the county as defendants was merely duplicative.") (citation omitted).

87 (2009), the Supreme Court held that the return of property rendered moot plaintiffs' claims for declaratory and injunctive relief (not damages) challenging the lawfulness of the state's civil forfeiture proceedings. *Id.* at 92-94. In doing so, the Court reasoned that "in any event, since those who are directly affected by the forfeiture practices might bring damages actions, the [civil forfeiture] practices do not 'evade review' [as an exception to the mootness doctrine]." *Id.* at 93-94 (citation omitted). In concluding its opinion in *Alvarez*, the Supreme Court also explicitly recognized: "nothing in this opinion prevents the plaintiffs from bringing a claim for damages based on the conduct alleged in their complaint." *Id.* at 97 (citation omitted). *Alvarez* strongly suggests Plaintiffs' procedural due process claims for damages are not now moot simply by the return of the firearm and cell phone.

Second, Defendants argue that they are entitled to summary judgment because Plaintiffs had adequate state remedies and therefore the due process requirement is satisfied. As the Eighth Circuit has explained of procedural due process claims:

> Due process is a flexible concept, requiring only such procedural protections as the particular situation demands. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. When a [city] employee's unauthorized, random acts deprive a person of property, the [city] employee's acts do not violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. … However, when an established [city] procedure or a foreseeable consequence of such a procedure causes the loss, an adequate postdeprivation remedy is of no consequence, and [the Court] focus[es] solely on the process afforded by the established procedure.

*Clark v. Kansas City Mo. Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (cleaned up). In *Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2001), the Eighth Circuit held that whether an adequate postdeprivation remedy exists is not relevant to a § 1983 procedural due process claim where "the refusal to return [the seized property] was not a random or unauthorized act," but was an "authorized decision" based on the police department's policy not to return the weapons and ammunition absent a court order to do so. *See id.* at 842-44.

As to the firearm,[20] the undisputed facts show it was seized from Mr. Fletcher's person when he was arrested on March 21, 2019. In *PPS, Inc. v. Faulkner County*, 630 F.3d 1098 (8th

---

[20] The amended complaint makes no reference whatsoever to ammunition seized in addition to the firearm. The Court therefore disregards any reference by Plaintiffs to ammunition in their summary judgment response. *See Wireco WorldGroup*, 897 F.3d at 992-93.

Cir. 2011), the Eighth Circuit recognized that the Fourth Amendment does not require predeprivation notice and opportunity to be heard in the criminal context where the property may be properly seized without a warrant under the so-called "warrant exceptions," *id.* at 1107, one of which is a search incident to a lawful arrest. *See Ariz. v. Gant*, 556 U.S. 332, 338 (2009) (recognizing and discussing this warrant exception). Plaintiffs argue that their procedural due process rights were violated because there was no procedure for the immediate return of the firearm and that "Defendants delayed . . . and avoided" return of the firearm on several occasions.

By Defendants' own admission, "Corporal Akers was unable to return the firearm to the [Plaintiffs] on previous occasions because they had active warrants out for their arrest." (Doc. 71 at 39, ¶ 70.) And in fact, Corporal Akers testified in her deposition that an "ATF rule" requires such warrant checks "to make sure they're not felons . . . as long as someone is a fugitive from justice and, as I was told, having warrants is considered a fugitive from justice, we are not allowed to release [a firearm]." (Doc. 89-8 at 27.) Corporal Akers testified in her deposition as follows:

> Q: And is that – does the Sugar Creek follow the ATF Rule? I mean, is that an ordinance that requires [the warrant search to release a firearm] or is that just something you do?
>
> A: That is something that I do because I don't want the firearms to be released when they should not be.

(*Id.* at 27-28.) At a minimum, there is at least a question of fact as to whether the firearm was not returned to Plaintiffs following a warrant check that was required by a city or police department policy (potentially in accordance with ATF policy) or not. The answer to this question will largely determine whether Plaintiffs' claim is barred by available postdeprivation remedies. In other words, if the firearm was not returned pursuant to an established policy of the City of Sugar Creek, Defendants would not be entitled to judgment as a matter of law on the availability of state remedies for the alleged property deprivation. *See Walters v. Wolf*, 660 F.3d 307, 315 (8th Cir. 2011) (summary judgment improper based on postdeprivation remedy where due process violation based on city's continued refusal – pursuant to an established policy – to return the handgun and ammunition after the circuit court dismissed the criminal charges and/or the plaintiff's active warrants were removed); *Lathon*, 242 F.3d at 843 (recognizing the rule that "when state officials deprive an individual of property pursuant to a state procedure or policy without predeprivation process, a § 1983 action may be brought regardless of whether there are adequate state postdeprivation remedies"). If, on the other hand, Corporal Akers' refusal to return the firearm

27

constitutes an "unauthorized, random act," i.e., the firearm was *not* withheld as the result of an established policy, Defendants would be entitled to judgment as a matter of law to the extent adequate state remedies otherwise exist. For this reason, Defendants have not satisfied their burden to show that the undisputed material facts demonstrate they are entitled to summary judgment as a matter of law as to Plaintiffs' procedural due process claim regarding the firearm because, viewed in a light most favorable to Plaintiffs, there is at least a material question of fact whether the firearms were withheld pursuant to an established policy or not.

Plaintiffs' procedural due process claim regarding the cell phone is different, however. Detective Butkovich testified in his deposition that he believed the cell phone had been illegally seized and that he ultimately did not obtain a search warrant for the cell phone despite Chief Soule's direction to do so. (Doc. 89-17 at 38-39.) Mr. Fletcher attested in his affidavit that "[n]o one with the city would ever tell us where or how we could pick up my cell phone and we were not given a receipt for it (until it was returned to us)." (Doc. 89-3 at 7, ¶ 40.) The cell phone was returned to Plaintiffs – with a broken SIM card – after a municipal court judge ordered that the cell phone be returned to Plaintiffs. (*Id.* at ¶¶ 41-42.) Unlike the seized firearm, the summary judgment record shows that the cell phone was seized and returned to Plaintiffs after some period of time as part of a random and unauthorized act rather than pursuant to an "authorized decision." Under these circumstances, the adequate-state-postdeprivation-remedy rule applies. *See Clark*, 375 F.3d at 702. And because Plaintiffs have an adequate state postdeprivation remedy for unlawful conversion, *see JCBC, LLC v. Rollstock, Inc.*, 22 S.W.3d 197, 203 (Mo. Ct. App. 2000) (elements for conversion claim under Missouri law), Defendants are entitled to summary as to Plaintiffs' procedural due process claim regarding the cell phone. *See Poole v. Cassaday*, No. 4:04CV01284 AGF, 2006 WL 8458882, at *4 (E.D. Mo. Jan. 11, 2006) (no § 1983 due process property claim where the plaintiff had adequate state court remedy for custodial negligence or unlawful conversion); *see also McCord v. Blake*, No. 4:04-CV-1185-CDP, 2007 WL 302208, at *1 (E.D. Mo. Oct. 12, 2007).

Summary judgment is denied on Count VIII (procedural due process claim regarding the firearm) and is granted on Count IX (procedural due process claim regarding the cell phone).

28

## IV. Conclusion

After careful consideration and for the reasons explained above, Defendants' motion for summary judgment (Doc. 70) is **GRANTED in part** and **DENIED in part** as follows:

- Count I (excessive force claim): summary judgment is granted in favor of Defendants Soule, Butkovich, and Stone regarding the uses of force used by Defendants Butkovich and Stone in the April 8 traffic stop to secure Mr. Fletcher in handcuffs, and is otherwise denied;

- Count II (failure-to-supervise and failure-to-train claim): summary judgment is granted as to Defendant Soule to the extent Defendants Butkovich and Stone are entitled to summary judgment as to the uses of force analyzed in Count I, and is otherwise denied;

- Count III (First Amendment retaliation claim): summary judgment is granted in favor of Defendants Soule, Larson, Richardson, and Layton and is denied as to Defendant Loving;

- Count IV (race-discrimination claim): summary judgment is granted;

- Count V (civil conspiracy claim): summary judgment is granted;

- Count VI (common law battery claim): summary judgment is denied;

- Count VII (*Monell* claim): summary judgment is granted only to the extent Plaintiffs' *Monell* claim rests on the allegations of excessive force discussed in Count I and due process violation discussed in Count IX, and is denied to the extent the *Monell* claim rests on the due process violation discussed in Count VIII;

- Count VIII (deprivation of property due process; firearm): summary judgment is denied; and

- Count IX (deprivation of property without due process; cell phone): summary judgment is granted.

**IT IS SO ORDERED**.


s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: October 24, 2022

29